**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term
Grand Jury Sworn in on May 31, 2018**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | **Grand Jury Original** |
| | : | |
| **IVAN OKOROKOV,** | : | **VIOLATIONS:** |
| | : | |
| **KAREN STEPANYAN,** | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy)** |
| **ILYA LOGINOV,** | : | |
| | : | **50 U.S.C. § 1705** |
| **ALEXY KONKOV,** | : | **(International Emergency** |
| | : | **Economic Powers Act Violations)** |
| **LIUDMILA SHMELKOVA,** | : | |
| | : | **31 C.F.R. Part 542** |
| **YASER NASER,** | : | **(Syrian Sanctions Regulations)** |
| | : | |
| **FARID BITAR,** | : | **31 C.F.R. Part 589** |
| | : | **(Ukraine Sanctions Regulations)** |
| **and** | : | |
| | : | **18 U.S.C. § 1956** |
| **GABRIEL BITAR** | : | **(Money Laundering)** |
| | : | |
| | : | **FORFEITURE** |
| | : | **18 U.S.C. § 981(a)(1)(C)** |
| | : | **28 U.S.C. § 2461(c)** |
| | : | **18 U.S.C. § 982(a)(1)** |
| | : | **21 U.S.C. § 853(p)** |

## I N D I C T M E N T

The Grand Jury charges that:

At times material to this Indictment:

## BACKGROUND

### I.    The International Emergency Economic Powers Act

1.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorizes the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat. Pursuant to the authority under IEEPA, the President and the executive branch have issued Executive Orders and regulations governing and prohibiting certain transactions with Syria, the Crimean region of Ukraine, and certain persons and entities related to Syria and Ukraine.

### II.    Syrian Sanctions

2.      On May 11, 2004, the President issued Executive Order 13338, declaring a national emergency to deal with the unusual and extraordinary threat to national security, foreign policy, and economy of the United States posed by the actions of the Government of Syria in supporting terrorism, continuing its occupation of Lebanon, pursuing weapons of mass destruction and missile programs, and undermining United States and international efforts with respect to the stabilization and reconstruction of Iraq. Executive Order No. 13338 has been continued and expanded by Executive Order Nos., 13399, 13460, 13572, 13573, 13582, 13606, and 13608 (collectively, the "Syria Executive Orders").

3.      The Syria Executive Orders imposed economic sanctions on Syria. They prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Syria of any goods, technology, or services from the United States or by a United States person. The Syria Executive Orders also prohibited any transaction by any United States

person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Syria Executive Orders.

4.      The Syria Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out" these sanctions against Syria. Pursuant to this authority, the Secretary of the Treasury, through the Office of Foreign Assets Control ("OFAC"), promulgated the Syrian Sanctions Regulations, 31 C.F.R. Part 542, implementing the sanctions required by the Syria Executive Orders. The conduct described herein was unlawful under the Syrian Sanctions Regulations.

5.      Specifically, absent permission from OFAC in the form of a license, the Syrian Sanctions Regulations prohibited, among other things:

a.      The exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any services to Syria;

b.      Any transaction by a U.S. person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in the regulations;

c.      United States persons, wherever located, from approving, financing, facilitating, or guaranteeing a transaction by a foreign person where the transaction by that foreign person would be prohibited by the Regulations if performed by a United States person or within the United States;

d.      Transactions in property that was in the United States, came within the United States, or that was or came within the possession or control of any

United States person, including any foreign branch, of the Government of Syria or any other person whose property and interests in property are blocked;

e. Transactions involving persons who materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the Government of Syria or any other person whose property and interests in property are blocked; and

f. Transactions involving blocked property owned or controlled by, directly or indirectly, the Government of Syria or any other person whose property and interests in property are blocked.

## III.   Ukrainian and Crimea Region Sanctions

6.      Beginning on March 6, 2014, the President issued Executive Order 13660 declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined the democratic process and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. Executive Orders No. 13660 has been continued and expanded by Executive Order Nos., 13661, 13662, and 13685 (collectively, the "Ukraine Executive Orders").

7.      The Ukraine Executive Orders together authorize, among other things, the imposition of sanctions against: persons responsible for or complicit in certain activities with respect to Ukraine; officials of the Government of the Russian Federation; persons operating in the arms or related material sector of the Russian Federation; individuals and entities operating in the Crimea region of Ukraine; and entities operating in specified sectors of the Russian Federation

economy. The Ukraine Executive Orders also prohibit the importation or exportation of goods, services, or technology to or from the Crimea region of Ukraine, and prohibits new investment in the Crimea region of Ukraine by a U.S. person, wherever located.

8.      The Ukraine Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations . . . as may be necessary to carry out the purposes of this Order." Pursuant to this authority, the Secretary of the Treasury, through the Office of Foreign Assets Control ("OFAC"), promulgated the Ukraine Related Sanctions Regulations, 31 C.F.R. Part 589, implementing the sanctions required by the Ukraine Executive Orders. The conduct described herein was unlawful under the Ukraine Related Sanctions Regulations.

9.      Specifically, absent permission from OFAC in the form of a license, the Ukraine Related Sanctions Regulations prohibited, among other things: all transactions prohibited pursuant to the Ukraine Executive Orders, including the provision of services by U.S. persons for individuals and entities designated pursuant to the Ukraine Executive Orders and listed on the List of Specially Designated Nationals ("SDN") and Blocked Persons (SDN list).

## IV.    Entities and Individuals

10.     On May 18, 2011, OFAC designated Syrian President Bashar Al Assad ("Assad") and the Syrian regime for human rights abuses, including repression of the Syrian people.

11.     Ports Banias and Tartous, Syria were major ports used by the Syrian government to import and export oil.

12.     The government-owned Syrian Company for Oil Transport ("SCOT") acted as the Port Authority for Ports Banias and Tartous. On August 18, 2011, OFAC designated SCOT

pursuant to Executive Order 13582, for managing Syria's oil export/import terminals at Ports Banias and Tartous.

13.     The government-owned Banias Refinery Company was responsible for processing oil imported into Port Banias. On May 8, 2014, OFAC designated the Banias Refinery Company, pursuant to Executive Order 13582, for processing petroleum that was imported into the Syrian Port of Banias. The designation noted that the Syrian regime used Port Banias to illicitly import millions of dollars' worth of energy products including petroleum gas and gasoil.

14.     The government-owned Syrian Shipping Agencies Company ("SHIPCO") acted as the Port Agent for shipments into Ports Banias and Tartous. On August 3, 2015, OFAC designated SHIPCO pursuant to Executive Order 13582, for being property in which the Government of Syria had an interest.

15.     Co-conspirator JOINT STOCK COMPANY SOVFRACHT ("SOVFRACHT") was a Russian shipping company and freight forwarder. According to co-conspirator SOVFRACHT, it focused on providing transport and logistics services with a focus on rail transportation, overseas shipping, and oil products. Freight forwarders organize shipments for individuals or corporations to get goods from the manufacturer or producer to a market.

16.     On September 1, 2016, OFAC designated co-conspirator SOVFRACHT pursuant to the Ukraine Executive Orders, because the company operated in the Crimea region of Ukraine. The designation prohibited co-conspirator SOVFRACHT from engaging in any U.S. dollar transactions that occurred in whole or in part in the United States, and prohibited any good, technology, or services from being exported, re-exported, sold or supplied, directly or indirectly, from the United States to co-conspirator SOVFRACHT. This prohibition prevented co-conspirator SOVFRACHT from engaging in U.S. dollar wire transactions, which transited through the U.S.

financial system, whether or not the wire transactions related to Crimea.

17.     Co-conspirator TRANSPETROCHART CO. LTD. ("TRANSPETROCHART") was a Russian based vessel operator. As of July 15, 2016, co-conspirator TRANSPETROCHART owned and operated the MUKHALATKA and YAZ, both of which are petroleum tankers. On December 20, 2016, OFAC designated co-conspirator TRANSPETROCHART pursuant to Executive Order 13685 for working with co-conspirator SOVFRACHT.

18.     The Syrian Sanctions, as well as the subsequent designation of the Banias Refinery Company, prohibited co-conspirator SOVFRACHT and co-conspirator TRANSPETROCHART from transporting petroleum into Port Banias using the Banias Refinery Company, where any related wire transaction transited the United States financial system.

19.     On or about September 9, 2016, the government sent notice of a forfeiture action of approximately $2,585,340.45, which funds OFAC had blocked when co-conspirator SOVFRACHT wired the funds through the United States financial system to Company A (defined below in paragraph 29), as part of a scheme to send jet fuel to Port Banias, Syria, via the MUKHALATKA. The forfeiture action noted that such U.S. dollar payments were in violation of IEEPA and money laundering laws.

20.     Co-conspirator MARITIME ASSISTANCE, LLC ("MARITIME") was a Russian based company that acted as a front company for co-conspirator SOVFRACHT after its designation and the filing of the forfeiture complaint. Co-conspirator MARITIME began transacting in U.S. dollars in or about October 2016. Co-conspirator MARITIME took over contracts to which co-conspirator SOVFRACHT had previously been a party. Numerous co-conspirator SOVFRACHT employees began working for, or on behalf of, co-conspirator MARITIME after co-conspirator SOVFRACHT's designation.

21.     IVAN OKOROKOV ("OKOROKOV") was an employee of co-conspirator SOVFRACHT, and also acted as an employee of co-conspirator MARITIME. Prior to working at co-conspirator SOVFRACHT, OKOROKOV was employed by the Russian Ministry of Defense. OKOROKOV acted as Director of Marine Transport Department for co-conspirator SOVFRACHT.

22.     ILYA LOGINOV ("LOGINOV") was an employee of co-conspirator SOVFRACHT. He acted as the General Director of co-conspirator SOVFRACHT.

23.     KAREN STEPANYAN ("STEPANYAN") was an employee of co-conspirator SOVFRACHT, and also acted as an employee of co-conspirator MARITIME. He acted as First Deputy Director of co-conspirator MARITIME.

24.     ALEXEY KONKOV ("KONKOV") was an employee of co-conspirator SOVFRACHT, and also acted as an employee of co-conspirator MARITIME.

25.     LIUDMILA SHMELKOVA ("SHMELKOVA") was an employee of co-conspirator SOVFRACHT, and also acted as an employee of co-conspirator MARITIME. She acted as a Department Head of co-conspirator MARITIME.

26.     YASER NASER ("NASER") acted as an agent for co-conspirator SOVFRACHT in Syria. After a bank in the United States rejected a wire payment going to Syria in October 2011 involving co-conspirator SOVFRACHT and NASER, NASER began using two United Arab Emirates-based front companies ("Front Company 1" and "Front Company 2"). NASER used Front Company 1 and Front Company 2 to circumvent U.S. sanctions and send U.S. dollars to Syria on behalf of co-conspirator SOVFRACHT. In total, co-conspirator SOVFRACHT wire transferred approximately $802,599.08 to Front Company 1 and Front Company 2 prior to co-conspirator SOVFRACHT's designation. Co-conspirator SOVFRACHT conducted no wire

transfers in its name to Front Company 1 and Front Company 2 after its designation. Before co-conspirator SOVFRACHT's designation, Front Company 1 engaged in no U.S. dollar wire transactions with co-conspirator MARITIME, but after the designation, Front Company 1 and Front Company 2 wired co-conspirator MARITIME approximately $1,476,007.93.

27.     FARID BITAR ("F. BITAR") was a Petroleum Inspector at Port Banias, Syria. He was responsible for loading and discharging crude oil and other petroleum products at Syrian Terminals.

28.     GABRIEL BITAR ("G. BITAR") was a Petroleum Inspector at Port Banias, Syria. He was responsible for loading and discharging crude oil and other petroleum products at Syrian Terminals.

29.     Company A was a European oil company dealing in a wide range of petroleum operations, including the storage and sale of jet fuel.

30.     Company B is a European company that supplies petroleum, lubricants, and related products and services for vessels worldwide. After OFAC blocked the above-described $2,585,340.45 in payments, co-conspirator SOVFRACHT used third parties such as Company B to continue U.S. dollar payments for shipments of jet fuel to Port Banias, Syria.

31.     Company C is a Canadian based company that contracted with co-conspirator MARITIME. Company C communicated with both  co-conspirator MARITIME and co-conspirator SOVFRACHT about the co-conspirator MARITIME shipments of jet fuel to Port Banias, Syria

## COUNT ONE
### The Conspiracy

32.     The allegations in paragraphs 1 through 31 of this Indictment are incorporated and re-alleged by reference herein.

33.     Beginning as early as approximately October 2011, the exact date being unknown to the Grand Jury, through approximately October 2017, within the District of Columbia and elsewhere, defendants, OKOROKOV, LOGINOV, STEPANYAN, KONKOV, SHMELKOVA, NASER, F. BITAR, and G. BITAR, did knowingly combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to:

      a.     commit offenses against the United States, that is, to cause banks in the United States to provide financial services to Syria and to a Syrian SDN without having first obtained the required license from OFAC, located in the District of Columbia, in violation of Title 50, United States Code, Sections 1702 and 1705, and the Syrian Sanctions Regulations, Title 31, Code of Federal Regulations, Parts 542.201, 542.205, and 542.207;

      b.     commit offenses against the United States, that is, to cause banks in the United States to provide financial services to co-conspirator SOVFRACHT, a SDN, without having first obtained the required license from OFAC, located in the District of Columbia, in violation of Title 50, United States Code, Sections 1702 and 1705, and the Ukraine Related Sanctions, Title 31, Code of Federal Regulations, Part 589.201; and

      c.     to defraud the Department of the Treasury by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of services from the United States to Syria and to a SDN without authorization or a license, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

34.     The conduct alleged in this Indictment began outside of the jurisdiction of any particular State or district, and later occurred within the District of Columbia and elsewhere, and is therefore within the venue of the United States District Court for the District of Columbia, as provided by Title 18, United States Code, Sections 3237(a) and 3238.

**Objects of the Conspiracy**

35.     The objects of the conspiracy were:

     a.      to enrich the defendants and other conspirators;

     b.      to pay in U.S. dollars for the illicit provision of jet fuel to Syria; and

     c.      to evade the regulations, prohibitions, and licensing requirements of the IEEPA, Syrian Sanctions Regulations, and Ukraine Sanctions Regulations.

**Manner and Means of the Conspiracy**

36.     The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

     a.      Defendants OKOROKOV, LOGINOV, STEPANYAN, KONKOV, SHMELKOVA, NASER, F. BITAR and G. BITAR, and other conspirators used e-mail accounts and other forms of communication to communicate with co-conspirators in English and Russian (which is translated below);

     b.      Beginning as early as in or around October 2011, defendants OKOROKOV, LOGINOV, STEPANYAN, KONKOV, SHMELKOVA, NASER, F. BITAR, G. BITAR, and other conspirators entered into contracts paid for in U.S. dollars to provide services to Syria;

     c.      Defendants OKOROKOV, LOGINOV, STEPANYAN, KONKOV, SHMELKOVA, NASER, and other co-conspirators acting as agents of co-

conspirator SOVFRACHT, coordinated with defendants F. BITAR and G. BITAR acting on behalf of the Banias Refinery Company and other conspirators to import jet fuel into Syria; and

d.      Defendants OKOROKOV, LOGINOV, STEPANYAN, KONKOV, SHMELKOVA, NASER, F. BITAR, G. BITAR, and other co-conspirators used co-conspirator TRANSPETROCHART's vessels to import jet fuel into Port Banias via the Banias Refinery Company, and to illegally pay for those shipments in part or in whole with wire transactions that transited through the U.S. financial system.

e.      Defendants OKOROKOV, LOGINOV, STEPANYAN, KONKOV, SHMELKOVA, NASER, F. BITAR, G. BITAR, and other conspirators concealed their illicit provision of services to Syria as part of a scheme to avoid U.S. sanction laws. These concealment tactics included:

   i.      using front companies and third-party companies to process U.S. dollar payments, which occurred in part in the United States, which transactions were otherwise prohibited by the Syrian sanctions;

   ii.     listing false end destinations on shipping documents that did not reference Syria; and

   iii.    having co-conspirator TRANSPETROCHART turn off the geolocation transponder in its tankers when travelling to Port Banias, Syria.

37.     Following co-conspirator SOVFRACHT's designation by OFAC in September 2016, co-conspirator SOVFRACHT used co-conspirator MARITIME to act as a front company to

circumvent U.S. laws, including those that prohibited financial transactions that transited through the U.S. financial system with co-conspirator SOVFRACHT, Syria, and with the Banias Refinery Company, and the related licensing requirements of IEEPA.

38.     Defendants   OKOROKOV,   LOGINOV,   STEPANYAN,   KONKOV, SHMELKOVA, NASER, F. BITAR, G. BITAR, and other conspirators used co-conspirator MARITIME after co-conspirator's SOVFRACHT's designation to conceal their continued illicit provision of services, including jet fuel, via co-conspirator TRANSPETROCHART's tankers to Syria as part of a scheme to avoid Syrian and Crimean sanction laws.

39.     Co-conspirator SOVFRACHT used co-conspirator MARITIME as a front company to engage in business that co-conspirator SOVFRACHT was prohibited from conducting based on its OFAC designation, as evidenced by:

a.     co-conspirator   MARITIME's   employees,   such   as   defendants OKOROKOV, STEPANYAN, KONKOV, and SHMELKOVA, also acting surreptitiously as employees of co-conspirator SOVFRACHT after its designation;

b.     co-conspirator MARITIME taking on U.S. dollar debts previously held by co-conspirator SOVFRACHT;

c.     co-conspirator MARITIME making payments on U.S. dollar contracts and invoices which were associated with co-conspirator SOVFRACHT;

d.     co-conspirator SOVFRACHT's employees communicating with third parties, such as co-conspirator TRANSPETROCHART's employees who were operating their tankers, regarding contracts involving co-conspirator MARITIME; and

e.      co-conspirators SOVFRACHT and MARITIME using the same front companies and third-party companies to process U.S. dollar payments, which occurred in part in the United States, which were otherwise barred due to the Syrian and Ukrainian sanctions.

40.     Defendants OKOROKOV, STEPANYAN, KONKOV, SHMELKOVA, and other conspirators entered into contracts following co-conspirator SOVFRACHT's designation, for payment in U.S. dollars by MARITIME, totaling approximately $48,132,774.00;

41.     Defendants LOGINOV, OKOROKOV, STEPANYAN, KONKOV, SHMELKOVA, NASER, F. BITAR, G. BITAR, and other conspirators caused U.S. dollar wires transactions to be made by persons or entities on the SDN list, and for the benefit of such entities, without first obtaining a license or other authorization from OFAC.

## Overt Acts

42.     In furtherance of this conspiracy, and to accomplish its purposes and objects, at least one of the conspirators committed or caused to be committed, in the District of Columbia, and elsewhere, at least one of the following overt acts, among others:

a.      Co-conspirator SOVFRACHT Strips Wire Details to Circumvent Syrian Sanctions

1)      On or about October 11, 2011, co-conspirator SOVFRACHT attempted to wire approximately $128,635.96 to "Person 1" in Syria, however, the U.S. bank processing the transaction rejected the payment for sanctions violations.

2)      On or about October 17, 2011, co-conspirator SOVFRACHT informed NASER that the wire reference from the transaction in the previous paragraph would be changed from Syria to Lebanon.

3)      On or about October 17, 2011, co-conspirator SOVFRACHT attempted a second wire in the same amount, $128,635.96, purportedly with a final destination of Lebanon and Person 1 as the beneficiary, which was ultimately rejected by a U.S. bank.

4)      On or about October 19, 2011, NASER and SHMELKOVA received an email from the official co-conspirator SOVFRACHT email account, which stated that OFAC rejected the wire to Person 1, that an OFAC license would be needed to complete the transaction, and that the transactions involved a sanctioned OFAC entity.

b.      <u>Defendants and Co-conspirators Continued to Circumvent Syrian Sanctions</u>

5)      On or about May 22, 2013, SHMELKOVA forwarded an email from OKOROKOV to NASER regarding port services for a shipment of goods into Port Tartous, Syria.

6)      On or about May 13, 2015, G. BITAR directed a customer not to mention Syria or the Port Banias Terminal when making a U.S. dollar payment.

7)      On September 24, 2015, STEPANYAN sent an email directing NASER and a Russian petroleum company to note that the Port of unloading for the YAZ would be the same as the MUKHLATKA's port.

8) On or about October 9, 2015, co-conspirator SOVFRACHT wired approximately $31,366.02 through the United States to Front Company 2 for the delivery of goods that went to Tartous, Syria.

9) On or about October 9, 2015, OKOROKOV emailed NASER and cc'ed LOGINOV and STEPANYAN that the shipping agent at Port Tartous for co-conspirator SOVFRACHT was SHIPCO.

10) On or about October 29, 2015, G. BITAR directed a customer, with F. BITAR cc'ed to the email, to keep the tanker's movements confidential because "some parties try to use this information's against our country to impede the tankers to arrive Syrian terminals because the western sanctions."

11) On or about January 11, 2016, F. BITAR sent an email to NASER indicating that the MUKHALATKA unloaded jet fuel at Port Banias, Syria.

12) On or about January 11, 2016, NASER forwarded the email described in the previous paragraph to OKOROKOV and the official co-conspirator SOVFRACHT email account.

13) On or about March 21, 2016, F. BITAR sent an email to NASER indicating that the MUKHALATKA unloaded jet fuel at Port Banias, Syria.

14) On or about March 21, 2016, NASER forwarded the email described in the previous paragraph to the official co-conspirator SOVFRACHT email account.

15) On or about April 10, 2016, F. BITAR sent an email to NASER indicating that the MUKHALATKA unloaded jet fuel at Port Banias, Syria.

16) On or about April 10, 2016, NASER forwarded the email described in the previous paragraph to the official co-conspirator SOVFRACHT email account.

17) On or about May 10, 2016, F. BITAR sent an email to NASER indicating that the MUKHALATKA unloaded jet fuel at Port Banias, Syria.

18) On or about May 10, 2016, NASER forwarded the email described in the previous paragraph to the official co-conspirator SOVFRACHT email account.

19) On or about April 30, 2017, G. BITAR emailed a customer and cc'ed F. BITAR that SHIPCO was the mandatory agent for all tankers coming to Port Banias.

c. Co-conspirator SOVFRACHT's transshipment of Jet Fuel from Company A to Syria

20) On or about May 20, 2015, co-conspirator SOVFRACHT entered into Agreement S/B-20/05/15 with Company A.

21) On or about December 13, 2015, NASER emailed the official co-conspirator SOVFRACHT email account a forwarded message from F. BITAR that the MUKHALATKA had delivered 2,217.174 metric tons of jet fuel to Port Banias, for which Company A subsequently requested payment of $1,263,789.18 pursuant to Agreement S/B-

17

20/05/15 and invoice 007/12-11-2015.

22)     On or about January 10, 2016, co-conspirator SOVFRACHT acquired approximately 4,924.458 metric tons of jet fuel from Company A via the MUKHALATKA pursuant to Agreement S/B-20/05/15 and invoices 007/11-01-2016 and 007/13-01-2016.

23)     On or about January 12, 2016, co-conspirator SOVFRACHT wired approximately $1,312,500.00, which transaction was blocked while passing through the United States, to Company A, which wire included a payment instruction that stated, "INV 007/11-01-2016," which was the invoice number for the MUKHALAKTKA's jet fuel delivery to the Banias Refinery Company.

24)     On or about January 13, 2016, co-conspirator SOVFRACHT wired $1,272,840.45, which transaction was blocked while passing through the United States, to Company A, which wire included a payment instruction that stated "INV 007/13-01-2016," which was the invoice number for the MUKHALAKTKA's jet fuel delivery to the Banias Refinery Company.

25)     On or about January 14, 2016, an unindicted co-conspirator caused the MUKHALATKA to deactivate its transponder used for geolocation of the vessel, which is required to be kept on by such vessels during maritime travel, which precluded the MUKHALATKA from being tracked by geolocation while it delivered jet fuel to Port Banias, Syria.

26)     On or about January 14, 2016, OKOROKOV asked NASER to inform OKOROKOV and STEPANYAN about the preliminary delivery time for the MUKHALATKA's unloading of the jet fuel at Port Banias.

27)     On or about January 15, 2016, NASER responded to OKOROKOV that unloading began that day at 12:50.

28)     On or about January 16, 2016, NASER emailed the official co-conspirator SOVFRACHT email account to inform co-conspirator SOVFRACHT that the MUKHALATKA had unloaded 4,924.458 metric tons of jet fuel in Banias, Syria.

29)     On or about January 16, 2016, NASER emailed the official co-conspirator SOVFRACHT email account the petroleum inspection report for this shipment completed by the Banias Refinery Company.

d.     <u>Transactions Subsequent to Blocking and Prior to Co-Conspirator SOVFRACHT's Designation</u>

30)     On or about January 22, 2016, an unindicted co-conspirator MUKHALATKA official emailed OKOROKOV, STEPANYAN, and NASER that the MUKHALATKA had arrived in Port Banias and was ready to discharge 4,906.429 metric tons of jet fuel.

31)     On or about January 27, 2016, NASER emailed the official co-conspirator SOVFRACHT email account a forwarded message from F. BITAR that the MUKHALATKA had delivered the 4,906.429 metric tons of jet fuel to Port Banias, for which Company A

subsequently requested payment from Company B of $2,433,588.78 pursuant to Agreement S/B-20/05/15 and invoice 008/22-01-2016.

32) On or about February 23, 2016, an unindicted co-conspirator MUKHALATKA official emailed OKOROKOV, STEPANYAN, and other co-conspirators a bill of lading that falsely stated that the port of discharge was the "OPEN SEAS," when in fact the true discharge point was Port Banias.

33) On or about March 27, 2016, NASER emailed the official co-conspirator SOVFRACHT email account a bill of lading that falsely stated that the port of discharge was the "OPEN SEA," when in fact the true discharge point was Port Banias.

34) On or about April 1, 2016, G. BITAR forwarded an e-mail to OKOROKOV via his co-conspirator SOVFRACHT e-mail account, with F. BITAR and STEPANYAN cc'ed, in which OKOROKOV and G. BITAR discussed that the YAZ had sailed from Port Banias.

35) On or about April 7, 2016, STEPANYAN emailed OKOROKOV, NASER, and an unindicted co-conspirator MUKHALATKA official about the arrival of the MUKHALATKA into Port Banias to unload jet fuel.

e.   Co-conspirator MARITIME Made Payments to Third Parties on Contracts Negotiated by Co-conspirator SOVFRACHT Prior to Its Designation

36) On or about September 23, 2016, co-conspirator MARITIME emailed Company B that co-conspirator MARITIME "was nominated As [the] new General Agent of the Russian Navy Fleet

for managing all calls to Worldwide Ports."

37) In or about October 2016, co-conspirator MARITIME began sending U.S. dollar wires for the benefit of co-conspirator SOVFRACHT after the designation of co-conspirator SOVFRAHCT.

38) On or about December 20, 2016, LOGINOV emailed OKOROKOV, STEPANYAN, and other conspirators that OFAC had designated co-conspirator TRANSPETROCHART for being linked to co-conspirator SOVFRACHT.

    i.    <u>Co-conspirator SOVFRACHT's and MARITIME's transactions with Company B</u>

39) On or about January 14, 2011, co-conspirator SOVFRACHT entered into agreement S/A/14/01/11 with Company B.

40) On or about September 15, 2016, co-conspirator MARITIME entered into agreement B-03/2016 with Company B.

41) On or about October 31, 2016, co-conspirator MARITIME received an invoice from Company B for the delivery of jet fuel pursuant to agreement S/A/14/01/11, which was an agreement with co-conspirator SOVFRACHT.

42) On or about November 20, 2016, co-conspirator MARITIME caused Company B to load jet fuel onto a petroleum tanker with a larger capacity than either the MUKHALATKA or YAZ, as reflected in invoice 347309.

43) On November 25, 2016, an unindicted co-conspirator

MUKHALATKA official emailed OKOROKOV, STEPANYAN, and other co-conspirators shipping documents indicating that jet fuel obtained from Company B was transshipped from the larger capacity petroleum tanker via a ship-to-ship transfer to the MUKHALATKA and delivered to Port Banias, Syria.

44)  On or about November 28, 2016, an unindicted co-conspirator YAZ official emailed other co-conspirators shipping documents indicating that additional jet fuel obtained from Company B was transshipped from the larger capacity petroleum tanker via a ship-to-ship transfer to the YAZ and delivered to Port Banias, Syria.

45)  On or about December 9, 2016, co-conspirator MARITIME wired $2,601,516.85 to Company B for the loading of jet fuel from the larger capacity petroleum tanker via a ship-to-ship transfer onto the YAZ and MUKHALATKA for delivery to Port Banias, Syria, which payment was related to invoice number 347309.

46)  On or about December 12, 2016, co-conspirator MARITIME wired an additional $2,625,496.99 to Company B for the loading of jet fuel from the larger capacity petroleum tanker via a ship-to-ship transfer onto the YAZ and MUKHALATKA for delivery to Port Banias, Syria, which payment was related to invoice number 347309.

47)  On or about January 18, 2017, co-conspirator MARITIME caused Company B to wire $2,910,036.84 to Company C for the purchase of jet fuel, which was later transshipped via the YAZ, and which

wire referenced invoice 029/A.

48)     On or about January 25, 2017, OKOROKOV and STEPANYAN at their co-conspirator SOVFRACHT email accounts received the bill of lading related to the $2,910,036.84 payment on invoice 029/A from an unindicted co-conspirator YAZ official, which indicated that the YAZ engaged in a ship-to-ship transfer and that the port of discharge was "ONE SAFE PORT IN THE MEDITERRANEAN SEA."

49)     On or about May 15, 2017, an unindicted co-conspirator YAZ official emailed a bill of lading to Company B, OKOROKOV, STEPANYAN, and other co-conspirators at their co-conspirator SOVFRACHT email accounts about a shipment of 5,058.6710 metric tons of jet fuel.

50)     On or about May 31, 2017, co-conspirator MARITIME received an invoice from Company B for the shipment of 5,058.6710 metric tons of jet fuel referenced in the previous paragraph.

ii.     Co-conspirator MARITIME's transactions with Company C on Co-conspirator SOVFRACHT's shipments

51)     On or about October 28, 2016, OKOROKOV emailed KONKOV and cc'ed STEPANYAN contract A-16-023 between Company C and co-conspirator MARITIME for the delivery of fuel via the MUKHALATKA, which indicated payment was to be made to Company C via a correspondent bank in the United States.

52)     On or about October 28, 2016, KONKOV emailed OKOROKOV an

invoice to co-conspirator MARITIME for contract A-16-023, which indicated payment of $2,656,250.00 was due.

53) On or about March 22, 2017, OKOROKOV forwarded an email from his personal account to his co-conspirator SOVFRACHT account, which had attached to it contract A-17-015 between co-conspirator MARITIME and Company C for the shipment of jet fuel.

54) On or about March 10, 2017, OKOROKOV informed KONKOV and an unindicted co-conspirator Company C employee that the loading of the "5000 tons JET A-1 [fuel]" onto the MUKHALATKA would have to occur in Turkey because the owner of the vessel was on the "OFAC list."

55) On or about April 5, 2017, the unindicted co-conspirator Company C employee instructed OKOROKOV to keep her updated about a Russian tanker's movements at her alias email account, which was not associated with Company C.

56) On or about April 5, 2017, co-conspirator MARITIME wired $1,373,592.58, which transaction passed through the United States, to Company C, which wire included a payment instruction that stated, "AGR.A-17-015" and "INV 097/A."

57) On or about April 6, 2017, co-conspirator MARITIME wired $1,373,592.59, which transaction passed through the United States, to Company C, which wire included a payment instruction that

stated, "AGR.A-17-015" and "INV 097/A."

58)     On or about April 7, 2017, OKOROKOV, using his co-conspirator SOVFRACHT email account and co-conspirator SOVFRACHT signature block, emailed U.S. dollar wire payment details referencing "Maritime Assistance LLC," contract A-17-015, and invoice number 097/A to the unindicted co-conspirator Company C employee at her alias email account.

59)     On or about April 20, 2017, the unindicted co-conspirator Company C employee emailed OKOROKOV and cc'd KONKOV invoice number 117/A related to contract number A-17-015, which was for the transshipment of 5,047.495 metric tons of jet fuel to be loaded onto a Russian tanker at a cost of approximately $2,957,983.49.

60)     On or about May 2, 2017, F. BITAR emailed NASER and cc'ed G. BITAR the Banias Refinery Company inspection form for this shipment of 5,047.495 metric tons of jet fuel, which noted that transshipment was completed via the MUKHALATA to Port Banias.

61)     On or about May 10, 2017, co-conspirator MARITIME wired approximately $1,478,991.75 from Russia, which transaction was blocked while passing through the United States, to Company C for payment on invoice 117/A.

62)     On or about May 11, 2017, co-conspirator MARITIME wired $1,478,991.74 from Russia, which transaction was blocked while

passing through the United States, to Company C for payment on invoice 117/A.

63) On or about May 18, 2017, the unindicted co-conspirator Company C employee complained to OKOROKOV that these payments had been "blocked . . . for compliance reasons."

64) On or about May 19, 2017, OKOROKOV told the unindicted co-conspirator Company C employee that OKOROKOV was in touch with the bank and that he would keep the unindicted co-conspirator Company C employee posted about the blocked payment.

65) On or about May 25, 2017, LOGINOV told OKOROKOV that they needed to discuss with the unindicted co-conspirator Company C employee the procedure for paying in Euros, as well as the need to break up payments into smaller amounts.

66) On or about May 25, 2017, LOGINOV further instructed that future payments should have no indication of "jet A-1," but rather the neutral designation of "fuel" in the wire payment instructions.

67) On or about May 25, 2017, LOGINOV further stated that co-conspirator MARITIME "has been burned," that it was "unadvisable to make further use of it," and that they could not risk large U.S. dollar payments through co-conspirator MARITIME.

68) On or about May 25, 2017, LOGINOV further stated that the coconspirators had "to create a new (1 or more) clean company."

69) On or about October 26, 2017, OKOROKOV emailed LOGINOV

and cc'ed STEPANYAN, all at their co-conspirator SOVFRACHT email accounts, about the co-conspirator MARITIME U.S. dollar payments relating to invoice number 117/A for which payments were blocked.

    iii.    <u>Co-conspirator SOVFRACHT's and MARITIME's transactions with Company D</u>

70)    On or about July 20, 2015, co-conspirator SOVFRACHT entered into agreement 108/2015 with Company D.

71)    On or about November 7, 2016, after co-conspirator SOVFRACHT's designation, co-conspirator MARITIME entered into an agreement with Company D, wherein co-conspirator MARITIME assumed a $191,425.55 debt co-conspirator SOVFRACHT owed Company D on agreement 108/2015.

72)    On or about December 2, 2016, co-conspirator MARITIME wired approximately $191,415.95 to Company D, and included in the payment details a reference to agreement number 108/2015.

    iv.    <u>Co-conspirator SOVFRACHT's and MARITIME's transactions with Front Company 1</u>

73)    On or about November 7, 2016, co-conspirator MARITIME wired approximately $50,000.00 to Front Company 1, a company used by NASER, and included in the payment details a reference to a contract number previously negotiated by co-conspirator SOVFRACHT.

v.   Co-conspirator   SOVFRACHT's   and   MARITIME's transactions with additional companies

74)   On or about October 12, 2016, co-conspirator MARITIME wired approximately $271,841.05 to Company E, and included in the payment details a reference to a contract number previously negotiated by co-conspirator SOVFRACHT.

75)   On or about October 24, 2016, co-conspirator MARITIME wired approximately $86,624.71 to Company F, and included in the payment details a reference to a contract number previously negotiated by co-conspirator SOVFRACHT.

76)   On or about October 25, 2016, co-conspirator MARITIME wired approximately $30,033.42 to Company G, and included in the payment details a reference to a contract number previously negotiated by co-conspirator SOVFRACHT.

77)   On or about October 31, 2016, co-conspirator MARITIME wired approximately $110,705.47 to Company H, and included in the payment details a reference to a contract number previously negotiated by co-conspirator SOVFRACHT.

78)   On or about November 3, 2016, co-conspirator MARITIME wired approximately $1,042,791.58 to Company I, and included in the payment details a reference to a contract number previously negotiated by co-conspirator SOVFRACHT.

79)   On or about November 14, 2016, co-conspirator MARITIME wired approximately $45,903.71 to Company J, and included in the

payment details a reference to a contract number previously negotiated by co-conspirator SOVFRACHT.

80)     On or about November 22, 2016, co-conspirator MARITIME wired approximately $104,060.00 to Company K, and included in the payment details a reference to a contract number previously negotiated by co-conspirator SOVFRACHT.

81)     On or about January 30, 2017, co-conspirator MARITIME wired approximately $138,396.41 to Company L, and included in the payment details a reference to a contract number previously negotiated by co-conspirator SOVFRACHT.

82)     On or about February 12, 2017, co-conspirator MARITIME wired approximately $24,752.53 to Company M, and included in the payment details a reference to a contract number previously negotiated by co-conspirator SOVFRACHT.

83)     On or about March 3, 2017, co-conspirator MARITIME wired approximately $1,698.63 to Company N, and included in the payment details a reference to a contract number previously negotiated by co-conspirator SOVFRACHT.

(**Conspiracy to Commit Offenses against the United States and to Defraud the United States and the United States Department of the Treasury** in violation of Title 18, United States Code, Section 371)

## COUNT TWO
### (Conspiracy to Commit Money Laundering)

43.     The allegations in Paragraphs 1 through 31 and 36 through 42 of this Indictment

are incorporated and re-alleged by reference here.

44.     Beginning as early as approximately October 2011, the exact date being unknown to the Grand Jury, through approximately October 2017, within the District of Columbia and elsewhere, defendants, OKOROKOV, LOGINOV, STEPANYAN, KONKOV, SHMELKOVA, NASER, F. BITAR, and G. BITAR, did knowingly combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956(h).

## The Object of the Conspiracy

45.     It was the object of the conspiracy for defendants OKOROKOV, LOGINOV, STEPANYAN, KONKOV, SHMELKOVA, NASER, F. BITAR, and G. BITAR, together and with other persons both known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956(a)(2)(A), that is, by transporting, transmitting, or transferring, or attempting to transport, transmit, or transfer a monetary instrument or funds to a place in the United States from and through a place outside the United States, that is Russia, Canada, the United Arab Emirates and Syria, and from a place in the United States to and through a place outside the United States, that is Russia, Canada, the United Arab Emirates, and Syria, with the intent to promote the carrying on of specified unlawful activity, to wit, an offense relating to violations of the International Emergency Economic Powers Act.

**(Conspiracy to Commit Money Laundering**, in violation of Title 18, United States Code, Section 1956**)**

## FORFEITURE ALLEGATION

1.      Upon conviction of the offense alleged in Count One of this Indictment, the defendants shall forfeit to the United States any property, real or personal, which constitutes, or is derived from proceeds traceable to this offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to this offense.

2.      Upon conviction of the offense alleged in Count Two of this Indictment, the defendants shall forfeit to the United States any property, real or personal, involved in this offense, or any property traceable to such property pursuant to Title 18, United States Code, Section 982(a)(1). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, involved in this offense, and any property traceable to such property.

3.      The specific property subject to forfeiture includes:

    a.      approximately $1,478,991.75 wired on or about May 10, 2017 by co-conspirator MARITIME to Company C for payment on invoice 117/A;

    b.      approximately $1,478,991.74 wired on or about May 11, 2017 by co-conspirator MARITIME to Company C for payment on invoice 117/A;

    c.      the MUKHALATKA tanker with International Maritime Organization number 9676230; and

    d.      the YAZ tanker with International Maritime Organization number 9735323.

4.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

       a.       cannot be located upon the exercise of due diligence;

       b.       has been transferred or sold to, or deposited with, a third party;

       c.       has been placed beyond the jurisdiction of the Court;

       d.       has been substantially diminished in value; or

       e.       has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(a)(1), and Title 21, United States Code, Section 853(p)).

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia